IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiffs,<br><br>        vs.<br><br>RAHMAN M. NABAVI, AND ISABEL<br>M. MALLAR,<br><br>                    Defendants. | **4:16CR3039**<br><br><br>**FINDINGS, RECOMMENDATION,<br>AND ORDER** |

Defendants Isabel Mallar and Rahman Nabavi have moved to suppress all evidence obtained during a vehicle search conducted on January 15, 2016, all evidence obtained as fruit of the alleged illegal vehicle search, and any statements made during the traffic stop. (Filing Nos. 24 & 25). For the following reasons, Defendants' motions should be denied.

STATEMENT OF FACTS

After hearing extensive testimony and reviewing the documentary, audio and video evidence, the undersigned magistrate judge finds the following facts are credible.

On the morning of January 15, 2016, Deputy Jason Mayo of the Lancaster County Sheriff's Office was observing eastbound traffic on Interstate 80. His vehicle was parked in the median at a slight angle facing oncoming traffic. Around 11:50 a.m., Mayo observed an approaching Cruise America RV and noticed a large number of electronics in the windshield. As the RV was passing his vehicle, Mayo used a digital stopwatch and determined the RV was following only .80 seconds behind another vehicle at a speed of approximately 60 miles per hour. The gap between the vehicles was much closer than the distance needed to comply with the three-second guideline enunciated in the Nebraska

Driver's Manual. Mayo believed the RV driver was following too closely in violation of Nebraska law.

Mayo decided to follow the RV and conduct a traffic stop for following too closely. Mayo was unable to immediately pull out of his position in the median due to the traffic. Once on the interstate, Mayo caught up with the RV and saw it exit the interstate onto southbound Highway 77 at mile marker 397. He continued to follow the RV to the stoplight at Highway 77 and West Van Dorn Street. The RV began traveling east and Mayo followed. Mayo observed a red Scion with Georgia plates in the right-hand lane behind the RV. The Scion appeared to be speeding up in a manner which would block Mayo's ability to merge and stop the RV. (Filing No. 49 at CM/ECF p. 13). Mayo activated his overhead lights to initiate the stop and the Scion moved out the way, continuing eastbound.

The RV stopped. Mayo approached the passenger side of the RV to speak with the occupants and told them they were stopped for following too closely while on the interstate. The occupants stated the driver, Mallar, had received a ticket for speeding earlier on this trip, on her birthday. (See Exh. 1). Mallar and passenger Nabavi each provided Mayo their Georgia-issued driver's licenses. Mayo was also received the rental agreement for the RV. The rental agreement stated the vehicle was rented on January 9, 2016 at 3:55 pm and was due back on January 18, 2016. The rental price was over $2,100. After reviewing the documents Mayo asked Mallar to join him in his vehicle while he issued the warning.

While in the cruiser, Mayo and Mallar talked about Mallar and Nabavi's travel plans and Mallar's profession, and they engaged in other friendly banter. Mallar stated her boyfriend, Nabavi had surprised her with tickets to Las Vegas for her birthday. She said they arrived in Las Vegas on the 8th and stayed at Harrah's hotel on the Las Vegas

strip for "a few days." Mallar stated they decided to rent the RV for the drive home. She said she always wanted to try travelling in an RV and had thoughts of living out of one. Mallar had previously driven from Georgia to Las Vegas in a car and said the trip took around 28 hours. Mayo asked if they had seen any sights along their trip. Mallar stated there were a couple states she had not been to and specifically said they went to Twin Falls, Idaho. She excitedly described the sights there. (Exh. 1 at 6:50).

Based on his training and experience, Mayo knew Twin Falls, Idaho is located along a common route taken from southern Oregon to Georgia. He also knows Jackson and Josephine counties in southern Oregon are two of the highest marijuana producing counties in the United States.

When Deputy Jason Henkel arrived as backup for the traffic stop. Mayo asked Henkel to confirm the Vehicle Identification Number ("VIN") for the RV matched the rental agreement. Nabavi rolled down the passenger-side window and spoke with Henkel as Henkel checked the VIN. Nabavi stated he and Mallar flew to Las Vegas but decided to drive back to Georgia because Mallar had recently undergone surgery and was more comfortable driving back in an RV. In response to Henkel's questioning, Nabavi denied stopping anywhere on the trip back to Georgia.

Henkel returned to Mayo's vehicle and met Mayo near the trunk. They compared the stories provided by Mallar and Nabavi and realized there were inconsistencies. The deputies discussed the strangeness of the travelers' trip along Interstate 80—as Interstate 40 would have been a more direct route from Las Vegas to Georgia—and of their travel out of the way to Idaho. Mayo also informed Henkel of the Georgia-plated Scion which had been following the RV but Mallar had stated they were travelling alone. Henkel and Mayo determined they would each ask one of the occupants for consent to search the RV.

Henkel returned to the RV and asked Nabavi if there were any drugs or weapons, heroin, cocaine, methamphetamine, marijuana, or large sums of money in the RV. Nabavi denied having any of those items. Henkel noticed Nabavi's nervousness increased when he was asked about marijuana: Nabavi's carotid pulse became visible and his breathing became labored. (Filing No. 49 at CM/ECF p. 63). Henkel then asked for consent to search the RV. Nabavi was somewhat flustered, first agreeing to a search but then becoming agitated, asking why they were stopped, and then withdrawing his consent to a search. Henkel asked Nabavi to get out of the RV so he could conduct a canine sniff. Henkel and Nabavi walked back to Mayo's vehicle and Nabavi entered the back seat.

While Henkel was speaking with Nabavi, Mayo asked Mallar similar questions. Mallar also denied having any weapons, drugs, or money in the RV. Mayo asked for Mallar's consent to search the vehicle and she declined, explaining they were in a hurry to get back because they needed to clean and prep the RV for its return. Mallar and Mayo continued to engage in small talk until Mallar stopped mid-sentence, staring at Nabavi as he exited the RV and walked with Henkel to the cruiser.

When Henkel reached Mayo's cruiser, he asked to speak with Mallar outside. He asked Mallar why they had not flown back to Georgia. Mallar provided the same answer as before. Henkel asked if she had undergone surgery. She confirmed she had. She further said she had become ill on the flight to Las Vegas and because she had always wanted to live in an RV, they rented one for the return trip. After advising Mallar that Nabavi became "extremely nervous" when asked about marijuana in the vehicle, Henkel asked Mallar if there was a small amount of marijuana in the RV. She stated she smoked marijuana, but she did not have any with her or in the RV. Henkel informed Mallar that he was going to run his canine around the RV. Mallar and Nabavi stayed with Mayo in his vehicle as Henkel deployed his canine, Sacha, around the RV.

Henkel and canine Sacha have been a Nebraska State Patrol ("NSP") certified drug dog team since 2012, and they have been successfully tested and re-certified every year since. The yearly re-certification prior to Defendants' traffic stop occurred in October of 2015. (Exhs. 5 & 5A). Sacha received an overall score of 2.3[1] for searching and 2.5 for indicating based upon 10 test searches: Deputy Henkel received a 2.4 for his handling skills. (Exh. 5A). On the specific test search involving the exterior of an automobile, Sacha scored a 2 for both searching and indicating while Henkel received a 3 for his handling. Sacha is trained and certified to detect four types of narcotics: marijuana, methamphetamine, cocaine, and heroin. In addition to yearly training and certification, Henkel and Sacha train once a week for ten hours. They train in a wide variety of environments and scenarios, using amounts of drugs ranging from large quantities to trace amounts and residue.

When conducting a dog sniff, Henkel uses the command "gift" to instruct Sacha to begin. Henkel then guides Sacha through a sniff by pointing or "presenting" to parts of the vehicle, and by turning her in a small circle to sniff an area he believes was missed or to redirect her attention. Henkel will typically end the search if Sacha does not alert and

---

[1] NSP scoring for drug dog teams is as follows:
  1.00-1.74 Superior;
  1.75-2.49 Commendable;
  2.50-3.24 Typical;
  3.25-4.00 Suitable;
  4.01-5.00 Improvement Needed; and
  5.01-6.00 Unsatisfactory.
(Exh. 5A). In his own words, the Government's witness, Dale Fellin, an NSP certification judge, stated a score of one is extremely rare and means nothing can be performed better; two is really, really nice; three is where the average dog performs; four is acceptable, but it needs some improvement/might be a little sloppy; and a five is unacceptable. (Filing No. 50 at CM/ECF pp. 27–28).

indicate during the three passes around the vehicle, or when Sacha indicates to the odor of narcotics.[2]

Sacha is trained to locate the strongest source of odor for narcotics and to indicate once that source is found. Sacha's typical indicating behavior is sitting and looking toward the strongest scent. But Sacha may also lay down to indicate a "low" find (odor source at ground level), and she may stand, freeze, and stare at a "high" find (odor source above her nose level) or when a large amount of narcotics are involved.

On January 15, 2016, Henkel retrieved Sacha from his vehicle and walked her around the passenger side to approach the RV. Once Henkel and Sacha were near the front of Mayo's cruiser, Sacha began pulling on the leash to lead Henkel down the passenger side of the RV, taking deep nasal breaths along the side and cabin door of the RV. Sacha pulled away from the vehicle to go the bathroom in the ditch. Henkel then deployed Sacha around the vehicle in a counter-clockwise direction beginning at the back passenger corner. Sacha alerted again at the back passenger side, then at the cabin door, and finally at the passenger side door. Nabavi had left the passenger window rolled down and Sacha attempted to jump in the window several times. Henkel tried to redirect Sacha's attention by presenting low and turning her around. After being turned, Sacha's body became rigid, she stood and froze, and she barked. Henkel understood Sacha's behavior to be an indication to the presence of narcotics. This behavior occurred around 1 minute and 37 seconds into the search.

---

[2] Henkel and Defendants' witness used different terminology to describe a drug dog's behavior. For the purposes of these findings and recommendations, the undersigned magistrate judge adopts the following terminology: An "alert" describes a drug dog's spontaneous change in behavior when it has smelled a drug odor it was trained to detect, while an "indication" is the trained behavior the dog exhibits when it identifies the location of the strongest scent (and likely source) of the drug odor.

6

Deputy Henkel does not typically continue a canine sniff once Sacha indicates. But due to Sacha's "profound" reaction of attempting to jump into the vehicle, Henkel gave the defendants "the benefit of the doubt" and re-deployed Sacha around the vehicle.

As Henkel continued to walk Sacha around the RV, Sacha alerted around a small door at the back of the RV. Once on the passenger side, Sacha alerted at the cabin door and then passenger door, and she began salivating heavily. Sacha tried to jump through the open window again. Henkel made several attempts to redirect Sacha. He used the term "gift" several times, presented to other areas, and frequently metered her away from the vehicle. After her attempts to jump in, Sacha indicated to the odor of narcotics by standing and freezing for the second time. (Filing No. 49 at CM/ECF p. 78). Henkel ended the search after he observed the second indication. At this point, he had walked Sacha around the vehicle approximately 4 minutes and 10 seconds.

Deputy Henkel returned Sacha to his vehicle and informed Mallar and Nabavi that Sacha had indicated to the presence of narcotics. He asked Mallar again whether there was any small amount or personal use marijuana in the vehicle. Mallar replied in the negative. Henkel placed Mallar in the back of the cruiser with Nabavi. Henkel and Mayo searched the RV and found a large number of hockey bags containing marijuana inside the RV. Henkel returned to the cruiser to handcuff Mallar and Nabavi. Shortly thereafter, Mayo advised the defendants of their Miranda rights.

The RV was later taken to a facility and further searched. In total, the RV contained 39 hockey bags containing approximately 1,517 pounds of marijuana, various electronic devices, more than $3,000 in cash, and other evidence of criminal activity.

ANALYSIS

I.   Validity of Stop.

7

A traffic stop is legal if it is supported by probable cause to believe a law violation has occurred. Whren v. United States, 517 U.S. 806, 810 (1996). "An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation. This is true even if a valid traffic stop is a pretext for other investigation." United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) (internal quotations omitted). A traffic stop "is valid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot." United States v. Long, 532 F.3d 791, 795 (8th Cir. 2008) (quoting United States v. Chatman, 119 F.3d 1335, 1339-40 (8th Cir. 1997)).

Following a vehicle more closely than is "reasonable and prudent" is a violation of Nebraska law.  Neb. Rev. Stat. § 60-6, 140. And an officer can lawfully stop a vehicle for traveling too closely even if the officer intends to issue only a warning ticket. See United States v. Neumann, 183 F.3d 753, 755 (8th Cir. 1999); United States v. Lyton, 161 F.3d 1168, 1170 (8th Cir. 1998). The Nebraska Driver's Manual Guidelines provides a three-second guideline for following other vehicles.

Deputy Mayo has approximately four years of experience in traffic enforcement and criminal interdiction. Mayo testified that on January 15, 2016, he observed the approaching Cruise America RV and used his stopwatch to determine the RV was driving approximately 60 miles per hour and following a vehicle at a timed distance of only 0.80 seconds. Under the facts presented, Mayo had probable cause to stop the Defendant's vehicle. See United States v. Perez, 200 F.3d 576 (8th Cir. 2000)(upholding a Nebraska stop where driver was following lead vehicle by 1.18 seconds); see also United States v. Maldonado, No. CR15-4091, 2016 WL 3004653, at *5 (N.D. Iowa May 24, 2016) (a lack of video evidence depicting traffic violation "does not establish that any officers testified falsely").

Once a stop is initiated, "it should last no longer than is necessary to dispel the officer's suspicions." Long, 532 F.3d at 795 (citing United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001)). "[A] reasonable investigation of a traffic stop may include . . . requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose" of the trip. United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994) (citing United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993); United States v. Richards, 967 F.2d 1189, 1193 (8th Cir. 1992)). And an officer may verify the information provided by the driver by questioning other occupants of the vehicle. United States v. Foley, 206 F.3d 802, 805 (8th Cir. 2000) (citing United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995)).

A reasonable stop may also include completing "a number of routine but somewhat time-consuming tasks[,]" including "checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning." United States v. Barragan, 379 F.3d 524, 528–29 (8th Cir. 2004). Once this initial investigation and the purpose of the stop are complete, further detention is unreasonable, "'unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention'" United States v. Flores, 474 F.3d 1100, 1103 (8th Cir. 2007) (quoting Jones, 269 F.3d at 925). Requesting consent to search after the purpose of a stop has concluded does not violate the Fourth Amendment. Long, 532 F.3d 791 at 795.

Mallar sat in the patrol vehicle as Mayo completed a warning ticket. While Mayo was writing the warning, he asked about Mallar's trip and its purpose including whether they had made any additional stops. Once Henkel arrived, he proceeded to check the VIN and verify the vehicle matched the rental agreement. While checking the VIN, Henkel spoke with Nabavi about the purpose of the trip and stops made. Around this time, Mayo concluded the stop by explaining and providing the warning to Mallar. Henkel returned to

9

the patrol vehicle and he and Mayo discussed the defendants' different stories and other facts concerning the stop. The span from the time of the stop to issuing the warning was around 12 minutes and an additional two minutes was verifying the information Mallar provided through Nabavi's story. Mayo did not delay in completing the tasks needed to issue the warning and he did not perform or ask questions beyond the scope permitted by law during that time frame.[3]

"[O]nce an officer finishes the tasks involved with the traffic violation the purpose of the traffic stop is complete and further detention of the driver or vehicle would be unreasonable, unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention or unless the continued encounter is consensual." United States v. Englehart, 811 F.3d 1034, 1041 (8th Cir. 2016)(internal quotations omitted). "A dog sniff . . . is a measure aimed at detecting evidence of ordinary criminal wrongdoing," and, unlike a routine check of a driver's license or insurance card, conducting a dog sniff is not "an ordinary incident of a traffic stop." Rodriguez v. United States, _ U.S. _, 135 S.Ct. 1609, 1615 (2015) (internal quotation omitted). Therefore an officer who has stopped a driver for a traffic-related violation may not extend the stop for a dog sniff "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id.

Reasonable suspicion exists if an officer is aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[s] suspicion that a crime [is] being committed." United States v. Beck, 140 F.3d 1129, 1136 (8th Cir. 1998)(citations omitted). The court looks to the totality of the

---

[3] The court does not find the 'small talk' including questions regarding Mallar and Navabi's employment engaged in by Mayo to be counter to law. Mayo did not ask intrusive questions aimed at interrogation beyond the scope of the stop, but was having a mutual and friendly conversation with Mallar. See Muehler v. Mena, 544 U.S. 93, (2005)(rejecting the suggestion that questioning on a matter unrelated to the purpose of detention violated the Fourth Amendment).

circumstances when determining whether reasonable suspicion exists. Id. "[B]oth innocent and criminal acts can create reasonable suspicion." United States v. Juvenile TK, 134 F.3d 899, 903 (8th Cir. 1998) (citing United States v. Sokolow, 490 U.S. 1, 9 (1989)). Whether certain acts contribute to a finding of reasonable suspicion is determined by viewing them in light of the law enforcement officer's experience and training. United States v. Condelee, 915 F.2d 1206, 1209 (8th Cir. 1990)(internal citations omitted); Beck, 140 F.3d at 1136. But an officer's suspicion cannot be based on a mere hunch or circumstances which "describe a very large category of presumably innocent travelers." Id. (citing Reid v. Georgia, 448 U.S. 438, 440–41 (1980)).

Mayo has approximately ten years of law enforcement experience, including three years assigned to a narcotics task force, and four years assigned to traffic enforcement and criminal interdiction. With this training and experience, Mayo considered multiple aspects of the traffic stop on January 15, 2016 suspicious, including:

> (1) Mallar and Nabavi claimed they flew one way to Las Vegas, stayed on the Las Vegas strip a "few days," rented an RV for $2100, and began driving it back to Georgia. But the documents and Mallar's statement indicated Defendants' trip home began the day after they arrived in Las Vegas: The day after Defendants allegedly arrived in Las Vegas was Mallar's birthday and on that date, the RV was rented and Mallar stated she received a speeding ticket as she was driving en route through a town.

> (2) Nabavi and Mallar provided conflicting stories. Nabavi stated they were travelling to Georgia from Las Vegas, had not stopped along the way, and rented the RV because Mallar was uncomfortable flying due to a recent surgery. Mallar stated they rented the RV because she wanted to experience travelling and perhaps sometime living in such a vehicle, and they drove North to see Idaho before heading back to Georgia. Mallar never mentioned any post-surgical discomfort as a reason for driving instead of flying.

> (3) Mallar's claim that Defendants drove to Twin Falls, Idaho before heading back to Georgia was suspicious. Twin Falls is at least an eight-hour (one-way) detour of the direct route from Las Vegas to Georgia, and Mayo

knew Twin Falls was along a common route used to transport marijuana from southern Oregon (a common marijuana-source location).

(4) Accepting Navabi's story as true, (with no mention of a detour to Twin Falls), Defendants' travel on Interstate 80, compared to the more direct route of Interstate 40, was suspicious, particularly with no explanation for why an RV rented on the 9th was still traveling through the midwest on the 15th.

(5) Mallar had stated they were travelling back to Georgia alone. But Mayo saw a red Scion with Georgia plates follow the RV from the interstate to the place where the RV was finally pulled over, and the Scion appeared to be trying to block Mayo's path to the RV.

(6) Mallar's body language, including touching her face and later stopping mid-sentence to observe Nabavi's interaction with Deputy Henkel, indicated she was very nervous. And Nabavi's level of nervousness perceptibly increased when Henkel asked him whether there was any marijuana in the RV: His breathing became labored and his carotid pulse was visible.

Considered in the totality, these facts created a reasonable suspicion that Defendants were involved in criminal activity. See e.g., United States v. Pena-Ponce, 588 F.3d 579, 584 (8th Cir. 2009)(finding extreme nervousness, multiple cellphones, and inconsistent stories generated reasonable suspicion); United States v. Carpenter, 462 F.3d 981, 987 (8th Cir. 2006)(concluding nervous behavior, and unusual and suspicion travel plans provided reasonable suspicion to further detain a traveler to conduct a dog sniff); Jones, 269 F.3d at 929 (explaining nervousness combined with other more revealing facts can generate reasonable suspicion); see also United States v. Kopp, 45 F.3d 1450, 1453 (10th Cir. 1995)(finding suspicious travel plans, inconsistent answers, and nervousness were sufficient to constitute reasonable suspicion).

II.    Validity of Dog Sniff and Indication.

Defendants argue the canine, Sacha, did not indicate to the odor of narcotics from the RV, and even assuming the dog indicated, the indication was the result of cuing and is unreliable.

"The warrantless search of a vehicle is constitutional pursuant to the 'automobile exception' to the warrant requirement, if law enforcement had probable cause to believe the vehicle contained contraband or other evidence of a crime before the search began." United States v. Castaneda, 438 F.3d 891, 893 (8th Cir. 2006) (quoting United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003)). "A dog's positive indication [to the odor of narcotics] is enough to establish probable cause for the presence of a controlled substance if the dog is reliable." United States v. Sundby, 186 F.3d 873, 876 (8th Cir. 1999)(collecting cases). To establish the dog's reliability, the evidence need only show the dog was trained and certified to detect drugs. Id. "[A] detailed account of the dog's track record or education" is not required to establish reliability. Id.  But the defendant may challenge evidence of a dog's reliability, either by cross-examining the testifying officer or by introducing his own witness. Florida v. Harris, 133 S. Ct. 1050, 1057 (2013).

1.  The Indication.

Defendants first argue Sacha did not give a proper indication; that the sniff could not establish probable cause.

During a dog sniff, the dog's role is to determine whether the scent of illegal narcotics is present and, if so, to respond in a manner which conveys that information to the canine handler. Canines may have distinctive ways of 'alerting' to the presence of narcotics odors. United States v. Morales, 489 F.Supp. 2d 1250, 1252 (D.N.M. 2007);

United States v. Trayer, 898 F.2d 805, 808 (D.C. Cir. 1990). The role of the canine handler is to guide the dog through the search, interpret the dog's behavior, and communicate the dog's message.

> [T]he dog and handler function as an integral team. The dog is the sensor, and the handler is the trainer and interpreter. The handler's performance in both roles is inseparably intertwined with the dog's overall reliability rate. . . . Each dog develops an individual pattern for communicating an alert, which must be interpreted by the handler, or another familiar with that dog. Otherwise, for example, a reaction to the odor of food, or another animal, might be mistaken for an "alert" to drug odors. …. [T]he informant is the dog, not the handler. The handler merely interprets the dog's actions.

United States v. Paulson, 2 M.J. 326, 330 (A.F.C.M.R. 1976). See also United States v. Outlaw, 134 F. Supp. 2d 807, 813 (W.D. Tex. 2001) ("In some instances, an alert is simply an interpretation of a change in the dog's behavior by a human handler."); Robert C. Bird, An Examination of the Training and Reliability of the Narcotics Detection Dog, 85 Ky. L.J. 405, 424 (1997)("The handler's performance [as trainer and interpreter] is inseparably intertwined with the dog's overall reliability rate."). Since the handler serves the vital role of interpreting the dog's behavior, the court must determine the credibility of the handler's testimony and the reliability of the handler's interpretation of the canine's behavior. See United States v. Howard, 448 F. Supp. 2d 889, 899 (E.D. Tenn. 2006).

Henkel and Sacha have been working as a certified drug dog team since 2012. Deputy Henkel is attuned to Sacha's behavior, and explained that Sacha's alert is "a natural change in her body behavior" which occurs when she senses an odor she is trained to detect. (Filing No. 49 at CM/ECF p. 75). The alert communicates to Henkel that there is "something going on" and the indication tells him for certain. (Id.). Sacha alerts by taking deep nasal breaths and independently directing her sniff to a particular area. (Filing No. 49 at CM/ECF p. 75).

14

When Sacha began the canine sniff of Defendants' RV, she independently pulled Henkel down the passenger side of the vehicle and immediately began taking deep nasal breaths at the door into the RV's cabin. (See Exh. 2 at 9:52).[4] Sacha then made her way to the passenger door and continued to alert until she pulled away from the RV to go the bathroom in the ditch. Henkel then restarted the sniff at back passenger side of the vehicle working in a counterclockwise direction. Sacha again alerted along the passenger side of the vehicle, at the cabin door, and at the passenger door. Sacha attempted to jump through the open passenger window into the RV several times. Henkel tried to redirect Sacha's attention from the window. After being turned, Sacha alerted again, stood and froze, and barked.

Henkel testified Sacha's behavior was not typical, but it was also not new. Sacha's prescribed indication is sitting, but she has been trained to stand and freeze as a form of indication as well. Sacha stands and freezes by locking up her body and staring at a specific point where she has pinpointed the strongest source of the odor. (Filing No. 49 at CM/ECF p. 75). And in Henkel's experience with Sacha, she will sometimes stand and freeze if the find is higher off the ground or in the presence of a strong/overwhelming odor of narcotics. (Filing No. 50 at CM/ECF p. 10). Sacha also does not typically bark upon indication, but has displayed this behavior on rare occasions. (Filing No. 49 at CM/ECF p. 78). In this case, Henkel interpreted Sacha's bark as a sign of frustration because she was prohibited from jumping into the RV toward the strongest source of the odor. (Filing No. 50 at CM/ECF p. 18).

Interpreting Sacha's behavior and actions, Henkel concluded Sacha had alerted and indicated to the presence of narcotics. (Filing No. 49 at CM/ECF pp. 77–78). Henkel was surprised by the "profound" nature of Sacha's behavior, alert, and indication, (Filing

_____

[4] Based upon the positioning of the vehicles and placement of the Deputies' microphones, Exhibit 2 provides the best audio recording of the dog sniff, and Exhibit 1 provides the best video recording.

No. 50 at CM/ECF p. 13), and decided to provide the defendants "the benefit of the doubt" and ran Sacha around the RV again.

At the back of the RV, Sacha alerted at a small door. Once on the passenger side, Sacha again alerted at the cabin door and then passenger door, and she began salivating heavily.[5] Sacha attempted to jump through the open window again.[6] Henkel testified that shortly after her attempts to jump in, Sacha indicated to the odor of narcotics by standing and freezing for the second time. (Filing No. 49 at CM/ECF p. 78).

While Defendants argue the court should not rely upon Deputy Henkel's "subjective determination" of an indication, the court disagrees. Henkel has significant experience with Sacha and provided specific and reasonable examples of Sacha's behavior which communicated to him that Sacha had perceived the odor of narcotics. Deputy Henkel's testimony that Sacha alerted and indicated to the odor of narcotics is credible. See United States v. Clayton, 374 Fed. Appx. 497, 502 (5th Cir. 2010)("Fourth Amendment jurisprudence does not require drug dogs to abide by a specific and consistent code in signaling their sniffing of drugs to their handlers. So long as officers are able to articulate specific, reasonable examples of the dog's behavior that signaled the presence of illegal narcotics, this Court will not engage itself in the evaluation of whether that dog should have used alternative means to indicate the presence of the drugs.").

Regarding Henkel's reliable interpretation of Sacha's behavior, from March 26, 2015 until the date of this search, Henkel deployed Sacha in the field 39 times. (Exh. 7A). And Henkel interpreted Sacha's behavior to be an indication 26 times. Of the resulting

---

[5] Based on his experience with Sacha, Henkel interprets Sacha's drooling to show she has made a find and is waiting for a reward.

[6] Henkel's frustration at Sacha's attempts to jump through the window can be heard on the audio he said "she keeps trying to jump through the window ... she's alerting like crazy." (Exh. 2 at 13:51).

searches, an actual find of narcotics, drug paraphernalia, or currency was found in 25 out of the 26 times. (Exh. 7A). As reflected by these records, Henkel is very reliable at interpreting Sacha's alert and indication behaviors. Based on Deputy Henkel's credible testimony, Sacha indicated to the odor of illegal drugs in the RV twice by standing, freezing, and staring at the perceived source of the strongest odor.

2. Manner of the Dog Sniff.

Defendants argue that even if Sacha's behavior could be interpreted as an indication, it did not supply the necessary probable cause because the alleged indication was not reliable. Specifically, Defendants argue any indication was the result of Henkel's conscious or unconscious signals to Sacha and of Henkel's mishandling of Sacha.

False alerts and indications can result from a handler's conscious or unconscious cues to the dog. See United States v. Heir, 107 F. Supp. 2d 1088, 1096 (D. Neb. 2000). According to defense witness, Andre Falco Jimenez, a former police officer and dog trainer, Sacha's canine sniff was unreliable because Deputy Henkel cued Sacha in several ways. Falco Jimenez reviewed Sacha's sniff and heard Deputy Henkel's testimony. He claims Henkel prompted Sacha to alert because the canine sniff went beyond two minutes and Henkel kept redirecting Sacha to the passenger side. He explained:

> at some point the dog knows that if I just finally do something that pleases the handler, and the handler [] keeps circling the vehicle long enough, the dog will finally [indicate], I guess, because he's taking me back to this one spot eight times I should do something and the dog will eventually do something.

(Filing No. 50 at CM/ECF p. 70). Falco Jimenez also concluded that Henkel cued Sacha by providing the term "gift" multiple times.

Falco Jimenez does not mention Henkel's testimony that Sacha provided an indication around a minute and a half into the search. And he similarly did not acknowledge that Sacha consistently alerted on the passenger side of the vehicle and independently directed much of her attention to the open passenger window. Each of these facts negate much of Falco Jimenez' argument regarding the alleged cuing behavior. The first indication was within Falco Jimenez' prescribed time-limit and a large amount of the redirection and verbal cuing alleged by Falco Jimenez did not occur until after the first couple minutes of the search. (See Exh. 2). In fact, Falco Jimenez himself stated that the search began "half-way decent." And Henkel testified that his redirection or turning of canine Sacha was made as an attempt to direct Sacha away from her preoccupation with the open window.

Falco Jimenez ultimately testified he would not provide Henkel and Sacha a passable score on the NSP grading sheet for this sniff. But he admitted he is not familiar with the training and certification standards in Nebraska and he did not review these standards before providing his testimony in this case. (Filing No. 50 at CM/ECF p. 95–96).

The Government's expert, Dale Fellin, a canine training evaluator and instructor for the NSP, disagreed with Falco Jimenez' analysis. Fellin testified that under Nebraska's standards, there is no set time limit for a dog sniff. The time required depends on the dog and the circumstances of the case. According to Fellin, Sacha and Henkel maintained a good pace for searching, (Filing No. 50 at CM/ECF pp. 35-36), with Henkel's repeated use of the command "gift" providing an acceptable method of redirecting the sniff. (Id. at CM/ECF pp. 41–43). Overall, Fellin testified the canine sniff was "a little sloppy," but it was acceptable (Filing No. 50 at CM/ECF pp. 35), and "suitable" based on the Nebraska grading sheet. (Filing No. 50 at CM/ECF p. 28; Exh. 5A).

Falco Jimenez additionally challenges several overarching aspects of Henkel and Sacha's training and reliability. He essentially argues the canine training of every drug dog team certified through the NSP is flawed and insufficient. In fact, Falco Jimenez testified NSP's certification testing is inherently flawed and problematic. (Filing No. 50 at CM/ECF p. 69).

The court gives little weight to Falco Jimenez' conclusions regarding Sacha's performance and reliability. He has admitted he is not familiar with Nebraska's standards, and he did not evaluate the sniff in this case based upon those standards. His testimony as to the correct way—and perhaps the only correct way—to train and certify a drug dog was not credible. See Fed. R. Evid. 702. The court additionally notes that Falco Jimenez' current income is derived from owning and operating a canine training program and providing testimony for defendants in criminal or forfeiture cases. And on cross examination, he admitted that in a prior case, he essentially testified that no dog sniff is free from subconscious cuing. (Filing No. 50 at CM/ECF pp. 87–89).

Finally, for the purposes of a Fourth Amendment analysis, the question is not whether Sacha is perfect at performing canine sniffs, or even whether Nebraska's canine training and certification program is appropriate or sufficient. Rather, the court must decide whether a reasonable officer in Henkel's position would believe Sacha was qualified to search for the odor of narcotics and that she alerted and indicated to the odor of illegal drugs within the defendants' vehicle thus providing probable cause.

Henkel and Sacha have been an NSP certified drug dog team since 2012, and have been successfully tested and recertified every year since. In October of 2015, the date of Sacha's annual certification before the traffic stop at issue, for overall scoring, Henkel received a "commendable" for his handling and Sacha received an "commendable" score

19

for searching and a "typical" (very nearly commendable) score for indicating. (Exh. 5A). When tested on the exterior of vehicles, Henkel scored "typical" for handling and Sacha scored "commendable" for both searching and indicating. Regarding Sacha's deployment records, between March 26, 2015 and January 14, 2016, Sacha was deployed 39 times, and she indicated to the odor of narcotics 26 times. (Exh. 7A). Of the resulting searches, an actual find of narcotics, drug paraphernalia, or currency occurred with only a single exception.[7] Given Sacha and Henkel's training, certification, and nearly perfect deployment record, Henkel was reasonable in believing Sacha was qualified to search for the odor of illegal drugs, and that her indication was reliable and provided probable cause to search Defendants' RV.

Defendants' Fourth Amendment rights were not violated. There was probable cause to stop Defendants' vehicle, Defendants were not unlawfully detained, and there was probable cause to search the RV. Defendants' Fourth Amendment claims, including all claims to suppress the fruit of the traffic stop, detention, and search of the RV, should be denied.

III.   Statements.

Both Defendants seek to suppress statements allegedly made. Defendants argue statements should be suppressed under both the Fourth Amendment as fruit of an illegal stop, detention, and search, and under the Fifth Amendment as violations of Defendants' Miranda rights. (Filing No. 24-1 at CM/ECF p. 16; Filing No. 26 at CM/ECF p. 19). For the reasons previously stated, Defendants' Fourth Amendment challenges to the statements should be denied.

---

[7] The court notes even if drugs and/or money were not found on one occasion, that does not mean Sacha falsely indicated. Sacha is trained to detect the odor of illegal drugs, and that odor can linger even after the drugs are gone. Or the officers' search may not have found the drugs or tainted money actually present.

A defendant must be advised of his or her Miranda rights before being subjected to law enforcement questioning while in custody. For the purposes of Miranda, detention during an ordinary traffic stop is not custodial. Berkemer v. McCarty, 468 U.S. 420, 440 (1984). As such, any questioning during the traffic stop and before Defendants were arrested was not custodial interrogation for which Miranda rights were required. And once the marijuana was found, Deputy Mayo advised each of the defendants of their Miranda rights. (Exh. 1 at 34:50). Defendants' Fifth Amendment rights were not violated.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable John M. Gerrard, United States District Judge, pursuant to 28 U.S.C. § 636(b), that the motion to suppress filed by the defendants (Filing No. 24 & 25) be denied in their entirety.

The defendant is notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

IT IS ORDERED that the jury trial of this case is set to commence before John M. Gerrard, United States District Judge, in Courtroom 4, United States Courthouse, Lincoln, Nebraska, at 9:00 a.m. on March 20, 2017 or as soon thereafter as the case may be called, for a duration of three (3) trial days.  Jury selection will be held at the commencement of trial.

Dated this 13th day of February, 2017.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge